IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| THURMON E. MOORE, II, | ) | |
| AIS #178615, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:14-cv-865-MHT |
| | ) | |
| CORIZON MEDICAL SERVICES, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I.  INTRODUCTION**

This 42 U.S.C. § 1983 action is before the court on a complaint and amendment to the complaint filed by Thurmon E. Moore, II, a state inmate, in which he challenges the adequacy of medical treatment provided to him for chronic hip pain from 2012 until the filing of this complaint in August of 2014.[1] Docs. 1 at 2–3 & 20 at 1–3.  The defendants remaining in this cause of action are Corizon Medical Services ("Corizon"),[2] the contract medical care provider for the state prison system, and Dr. Hugh Hood, the Associate Regional Medical Director for Corizon.  Moore seeks a declaratory judgment, injunctive relief and monetary damages for the alleged violation of his constitutional rights. Docs. 1

---

[1] During the time relevant to the complaint, Moore was incarcerated at Limestone Correctional Facility and Staton Correctional Facility.  He is now incarcerated at Bibb Correctional Facility.

[2] Corizon Medical Services is now known as Corizon, LLC.  For purposes of this Recommendation and in the interest of clarity, the court will simply refer to this defendant as Corizon.

at 4 & 20 at 2.[3]  The defendants filed a special report and relevant evidentiary materials in support of their report (Doc. 31), including an affidavit from Dr. Hood and certified copies of Moore's medical records, addressing the claim of deliberate indifference raised in the complaint.  In these documents, the defendants deny that they acted with deliberate indifference to Moore's medical needs.

After receiving the defendants' special report, the court issued an order on October 3, 2014 directing Moore to file a response to this report and advising Moore that his response should be supported by affidavits or statements made under penalty of perjury and other evidentiary materials. Doc. 33 at 2.  The order specifically cautioned that "**unless within fifteen (15) days from the date of this order a party files a response in opposition which presents sufficient legal cause why such action should not be undertaken** . . . the court may at any time [after expiration of the time for the plaintiff filing a response] and **without further notice to the parties** (1) treat the special report and any supporting evidentiary materials as a motion for summary judgment and (2) after considering any response as allowed by this order, rule on the motion for summary judgment in accordance with the law." Doc. 33 at 2-3.  Moore filed a response to this order (Doc. 35), a declaration in support of his response (Doc. 38), and legal arguments and facts in opposition to the defendants' report. Doc. 39.

---

[3] With respect to injunctive relief, Moore requests that the court require the defendants to provide him prescriptions for previously prescribed narcotic pain medications—sold under the trade names LorTab and Norco—order diagnostic tests such as an MRI, and issue medical profiles prohibiting prolonged standing and allowing him a bottom bunk and a cane. Doc. 1 at 4.

Pursuant to the directives of the order entered on October 3, 2014, the court now deems it appropriate to treat the defendants' report (Doc. 31) as a motion for summary judgment, and concludes that summary judgment is due to be granted in favor of the defendants.

## II.  SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam); Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (holding that the moving party has the initial burden of showing there is no genuine dispute of material fact for trial).  The movant may meet this burden by presenting evidence indicating that there is no dispute of material fact or by showing that the nonmoving party has failed to present appropriate evidence in support of some

element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322–24; *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011) (holding that the moving party discharges his burden by showing that the record lacks evidence to support the nonmovant's case or that the nonmovant would be unable to prove his case at trial).

The defendants have met their evidentiary burden.  Thus, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3); *Jeffery*, 64 F.3d at 593–94 (holding that, once a moving party meets its burden, "the non-moving party must then go beyond the pleadings, and by its own affidavits [or statements made under penalty of perjury], or by depositions, answers to interrogatories, and admissions on file," demonstrate that there is a genuine dispute of material fact).  This court will also consider "specific facts" pleaded in a plaintiff's sworn complaint when considering his opposition to summary judgment. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014).  A genuine dispute of material fact exists when a party produces evidence that would allow a reasonable factfinder to return a verdict in its favor such that summary judgment is not warranted. *Greenberg*, 498 F.3d at 1263; *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1313 (11th Cir. 2007).  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Ft. Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted).  "[T]here must exist a conflict in

4

substantial evidence to pose a jury question." *Hall v. Sunjoy Indus. Group, Inc.*, 764 F. Supp. 2d 1297, 1301 (M.D. Fla. 2011) (citation omitted).

Although factual inferences must be viewed in a light most favorable to the plaintiff and *pro se* complaints are entitled to liberal interpretation, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *See Beard v. Banks*, 548 U.S. 521, 525 (2006); *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, Moore's *pro se* status alone does not compel the court to disregard elementary principles of production and proof in a civil case.

The court has undertaken a thorough and exhaustive review of the evidence contained in the record. After this review, the court finds that Moore has failed to demonstrate a genuine dispute of material fact precluding the entry of summary judgment in favor of the defendants.

## III. DISCUSSION

Moore alleges that from 2012 until he filed his complaint in August of 2014 the defendants acted with deliberate indifference to his chronic hip pain.[4] In support of this allegation, Moore asserts that Dr. Hood cancelled all of his pain medications. Doc. 1 at 2. In his amendment to the complaint, Moore identifies his pain medications as Lortab and Norco. Doc. 20 at 1. Moore further complains that medical personnel failed to provide

---

[4] The court limits its review to the allegations set forth in the complaint. *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment."); *Ganstine v. Secr. Fla. Dept. of Corr.*, 502 F. App'x 905, 909–10 (11th Cir. 2012) (holding that a plaintiff may not amend the complaint at the summary judgment stage by raising a new claim or presenting a new basis for a pending claim); *Chavis v. Clayton County Sch. Dist.*, 300 F.3d 1288, 1291 n.4 (11th Cir. 2002) (refusing to address a new theory raised during summary judgment because the plaintiff had not properly amended the complaint).

him a bottom-bunk profile and a cane profile, and also delayed examinations by physicians. Docs. 1 at 2 & 20 at 3.  Finally, Moore complains that Dr. Hood denied a request submitted by an on-site physician to refer Moore for an MRI. Doc. 1 at 3.

The defendants adamantly deny that they acted with deliberate indifference to Moore's medical needs.  Instead, they maintain that Moore had continuous access to health-care personnel and received treatment from medical professionals for his chronic hip pain, including an evaluation by and follow-up consultation with an off-site rheumatologist in February and April of 2011 (*see* Doc. 31-2 at 41–45); evaluations and examinations by the nursing staff including licensed practical nurses, registered nurses, and certified registered nurse practitioners[5] (*see* Doc. 31-2 at 14–16, 19–20, 25–32, 66–67, 70–74 & 83; Doc. 31-3 at 1–2, 7–12 & 16–18); evaluations and consultations with facility physicians (*see* Doc. 31-2 at 19, 26–30 & 33–34); prescriptions for various medications to alleviate his pain and discomfort such as Lortab, Norco, Voltaren, Ultram, Motrin, Mobic, Naproxen, Tylenol, and an analgesic balm (*see* Docs. 31-2 at 4–13 & 31-4 at 4–50); issuance of medical profiles for a bottom bunk, no heavy lifting, and limited standing (*see* Docs. 31-2 at 47 & Doc. 31-3 at 6 & 19), and the provision of x-rays to monitor his condition. *See* Docs. 31-2 at 75–77 & 31-3 at 21–22.  Dr. Hood avers that medical personnel evaluated Moore each time he appeared at sick call with complaints related to his hip pain, assessed his need for treatment, prescribed medications to alleviate the pain associated with his condition, ordered x-rays to monitor his condition, and

---

[5] Throughout his affidavit, Dr. Hood identifies the certified registered nurse practitioners ("CRNPs") as clinicians.

provided treatment to Moore in accordance with their professional judgment. Doc. 31-1 at 6–14.

To prevail on a claim concerning an alleged denial of medical treatment, at a minimum an inmate must show that the defendant acted with deliberate indifference to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989).  Specifically, medical personnel may not subject an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106; *Adams v. Poag*, 61 F.3d 1537, 1546 (11th Cir. 1995) (holding, as directed by *Estelle*, that a plaintiff must establish "not merely the knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal to treat or a delay in [the acknowledged necessary] treatment").

Under applicable federal law, medical malpractice does not equate to deliberate indifference:

> That medical malpractice—negligence by a physician—is insufficient to form the basis of a claim for deliberate indifference is well settled. *See Estelle v. Gamble,* 429 U.S. 97, 105–07, 97 S. Ct. 285, 292, 50 L. Ed. 2d 251 (1976); *Adams v. Poag,* 61 F.3d 1537, 1543 (11th Cir. 1995).  Instead, something more must be shown.  Evidence must support a conclusion that a prison [medical care provider's] harmful acts were intentional or reckless. *See Farmer v. Brennan,* 511 U.S. 825, 833–38, 114 S. Ct. 1970, 1977–79, 128 L. Ed. 2d 811 (1994); *Cottrell v. Caldwell,* 85 F.3d 1480, 1491 (11th Cir. 1996) (stating that deliberate indifference is equivalent of recklessly disregarding substantial risk of serious harm to inmate); *Adams,* 61 F.3d at 1543 (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. DeKalb Regional Youth Detention Ctr.,* 40 F.3d 1176, 1191 n.28 (11th Cir. 1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere

negligence and has adopted a "subjective recklessness" standard from criminal law); *Qian v. Kautz,* 168 F.3d 949, 955 (7th Cir. 1999) (stating "deliberate indifference" is synonym for intentional or reckless conduct, and that "reckless" conduct describes conduct so dangerous that deliberate nature can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

In order to establish "deliberate indifference to [a] serious medical need . . . , Plaintiff[] must show: (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009).   When seeking relief based on deliberate indifference, an inmate must establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (holding that, for liability to attach, the official must know of and then disregard an excessive risk to the prisoner). Regarding the objective component of a deliberate indifference claim, the plaintiff must first show "an objectively 'serious medical need[]' . . . and second, that the response made by [the defendants] to that need was poor enough to constitute 'an unnecessary and wanton infliction of pain,' and not merely accidental inadequacy, 'negligen[ce] in diagnos[is] or treat[ment],' or even '[m]edical malpractice' actionable under state law." *Taylor*, 221 F.3d at 1258 (internal citations omitted).   A medical need is serious if it is one that "'has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's

attention.'" *Goebert v. Lee County,* 510 F.3d 1312, 1325 (11th Cir. 2007) (quoting *Hill,* 40 F.3d at 1187).

In addition, "to show the required subjective intent . . , a plaintiff must demonstrate that the public official acted with an attitude of 'deliberate indifference' . . . which is in turn defined as requiring two separate things: 'aware[ness] of facts from which the inference could be drawn that a substantial risk of serious harm exists [] and . . . draw[ing] of the inference[.]'" *Taylor,* 221 F.3d at 1258 (internal citations omitted) (alterations in original). Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer,* 511 U.S. at 837; *Johnson v. Quinones,* 145 F.3d 164, 168 (4th Cir. 1998) (holding that a defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore a known risk to a serious condition to warrant a finding of deliberate indifference). Furthermore, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer,* 511 U.S. at 838.

> In articulating the scope of inmates' right to be free from deliberate indifference, . . . the Supreme Court has . . . emphasized that not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle,* 429 U.S. at 105, 97 S. Ct. at 291; *Mandel* [*v. Doe,* 888 F.2d 783, 787 (11th Cir. 1989)]. Medical treatment violates the eighth amendment only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rogers,* 792 F.2d at 1058 (citation

9

omitted).   Mere incidents of negligence or malpractice do not rise to the
level of constitutional violations. *See Estelle,* 429 U.S. at 106, 97 S. Ct. at
292 ("Medical malpractice does not become a constitutional violation
merely because the victim is a prisoner."); *Mandel*, 888 F.2d at 787–88
(mere negligence or medical malpractice 'not sufficient' to constitute
deliberate indifference); *Waldrop,* 871 F.2d at 1033 (mere medical
malpractice does not constitute deliberate indifference).   Nor does a simple
difference in medical opinion between the prison's medical staff and the
inmate as to the latter's diagnosis or course of treatment support a claim of
cruel and unusual punishment. *See Waldrop,* 871 F.2d at 1033 (citing
*Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir. 1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991); *Taylor*, 221 F.3d at 1258

(citation and internal quotations omitted) (holding that, to show deliberate indifference,

the plaintiff must demonstrate a serious medical need and then must establish that the

defendant's response to the need was more than "merely accidental inadequacy,

negligence in diagnosis or treatment, or even medical malpractice actionable under state

law").   Moreover, "as *Estelle* teaches, whether government actors should have employed

additional diagnostic techniques or forms of treatment is a classic example of a matter for

medical judgment and therefore not an appropriate basis for grounding liability under the

Eighth Amendment." *Adams*, 61 F.3d at 1545 (citation and internal quotations omitted);

*Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) ("A difference of opinion as to

how a condition should be treated does not give rise to a constitutional violation.");

*Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (holding that the mere

fact an inmate desires a different mode of medical treatment does not amount to

deliberate indifference violative of the Constitution); *Franklin v. Oregon*, 662 F.2d 1337,

1344 (9th Cir. 1981) (holding that prison medical personnel do not violate the Eighth

Amendment simply because their opinions concerning medical treatment conflict with that of the inmate-patient).

Dr. Hood submitted his affidavit and relevant medical records in response to the complaint filed by Moore.[6]  The portions of Dr. Hood's affidavit set forth herein are corroborated by the objective medical records contemporaneously compiled during the treatment process.  Dr. Hood addresses Moore's allegation of deliberate indifference, in pertinent part, as follows:

> As the Associate Regional Medical Director [for Corizon], I am not assigned to any one Alabama Department of Corrections (ADOC) facility. On occasion, I provide direct medical care to inmates in the absence of the facility's medical director or at the request of the facility's medical director.
> In preparing this Affidavit, I undertook an evaluation of the medical records of Thurmon E. Moore, II ("Mr. Moore"), an inmate . . . incarcerated at Staton Correctional Facility ("Staton") [at the time of this affidavit], in order to understand his complaints and evaluate the medical treatment he received at the Limestone Correctional Facility ("Limestone") and Staton Correctional Facility ("Staton").  A true and correct copy of excerpts from Mr. Moore's medical records are being submitted as Exhibit "A" to this Affidavit and my statements below include specific citations to the Bates-labels affixed to the pertinent portions of Mr. Moore's medical records.
> * * *
> It is my understanding from reading Mr. Moore's Complaint that he is dissatisfied with the level of care afforded him at Limestone and Staton in regards to chronic hip pain. Based upon my review of Mr. Moore's medical records, I can state to a degree of medical certainty that Mr. Moore received a more than adequate degree of medical treatment during his incarceration at Limestone and Staton and I cannot find any reason for him to claim that the medical treatment afforded him has been anything less than complete, appropriate and acceptable in all respects.
> Mr. Moore arrived at Limestone Correctional Facility in June of 2010. (COR016). After his arrival at Limestone, Mr. Moore underwent x-rays of his hips and knees in October of 2010, which indicated "modest

---

[6] Dr. Hood cites the medical records throughout his affidavit.  These citations reference the page numbers assigned these documents by the medical care provider.

degenerative spurring" at the junction of the femur and pelvis, i.e. the hip joint. (COR037). Bone spurring, as initially identified through these x-rays, are indicative of some degree of osteoarthritis. The standard of care for osteoarthritis and its common symptoms (including this form of spurring) include pain management through primarily non-steroidal anti-inflammatory medications. It is somewhat uncommon to refer patients of this nature for surgical treatment because any surgical procedure can leave patients with momentary relief followed by a dramatic decline of their condition resulting in increased spurring. As early as December 18, 2010, Mr. Moore began voicing complaints regarding the ineffectiveness of the pain medications prescribed for his on-going hip discomfort. (COR016). Thereafter, the medical staff monitored his condition on a routine basis, which included the prescription of certain pain medication including Lortab, and eventually, Mr. Moore received a referral for evaluation by an off-site rheumatologist. (COR017).

Mr. Moore saw a rheumatologist at Rheumatology Associates of North Alabama, P.C. in February of 2011. (COR038). The rheumatologist found no evidence of inflammatory synovitis (also known as "a connective tissue disease") but only underlying osteoarthritis and recommended an alteration of his medications. (COR038–44). Following this diagnosis, Mr. Moore engaged in extended discussions with the medical staff through sick call and routine follow-up appointments in which he requested and received narcotic pain medication. (COR003–4, 045, 056–58, 060). [The medical records indicate that Mr. Moore had been prescribed either Lortab or Norco, each a narcotic pain reliever composed of hydrocodone and acetaminophen, *see* Docs. 31-3 at 31-33 & 31-4 at 10, since August of 2011.] Mr. Moore continued to receive narcotic medications at his request through [mid-August] of 2012. (COR060 [and COR 068]). He also received certain "profiles" or medical authorizations allowing him to deviate from some standard prison protocols, including a profile limiting the amount of time spent standing (COR046, 048–49).

Mr. Moore submitted a sick call request related to his pain medications on May 17, 2012 [indicating he was "very upset" with the physician's May 15, 2012 order to decrease the dosages of Norco from three times per day to two times per day], and received an evaluation during sick call the next day. (COR065). In fact, the [nurse consulted with the] site physician . . . during the course of sick call to discuss [Mr. Moore's] current medications. (COR065). [The physician advised the nurse that the medication would continue to be dispensed two times per day.] After submitting another sick call request form [on May 23, 2012] and submitting to evaluation during sick call [on the same date] (COR066), Mr. Moore attended an appointment with the clinician [on May 25, 2012] at Limestone

12

during which he complained about the recent alteration of his pain medications. (COR024). As indicated in these notations, Mr. Moore did show some signs of medication dependence with generalized complaints of discomfort. (COR024). Overall, his physical examination at the time was normal. (COR024). [The clinician therefore referred Mr. Moore to the physician "for evaluation of pain medication." COR024]. Mr. Moore next saw the site physician at Limestone on May 30, 2012[.]

Doc. 31-1 at 1–2 & 6–8 (internal paragraph numbering omitted).

During the evaluation on May 30, 2012, the site physician noted that the x-rays performed on Moore indicated only osteoarthritis. Doc. 13-2 at 26. The medical records further demonstrate that during the May 30, 2012 evaluation of Moore the attending physician ordered that he again receive two five-milligram tablets of Norco three times per day. Doc. 31-2 at 10 & 26; Doc. 31-4 at 10. After this evaluation, Moore did not submit any complaints or sick call requests related to his prescribed medications for hip pain for more than two months. On August 14, 2012, during a follow-up appointment with Moore, the site physician recommended a renewal of Moore's Norco prescription for an additional 90 days and also provided Moore a prescription for 800 milligrams of Motrin, a nonsteroidal anti-inflammatory drug ["NSAID"], three times per day for ninety days.[7] Doc. 31-2 at 10 & 27; Doc. 31-4 at 19. However, the medical records establish that Dr. Hood did not approve the continuation of Norco for Moore, so he did not receive it. Doc. 31-4 at 14 & 16.

The affidavit of Dr. Hood continues, in relevant part, as follows:

---

[7] The medical records indicate that common NSAIDs utilized in the treatment of pain and inflammation associated with osteoarthritis include Motrin (Ibuprofen), Mobic (Meloxicam), Tylenol (Acetaminophen) and Naproxen/Aleve (Naprosyn).

In response to a sick call request form submitted on August 20, 2012, the medical staff summoned Mr. Moore to the health care unit at Limestone for sick call on August 21, 2012 (COR071–73), and a subsequent appointment with the clinician on August 23, 2012.  During the appointment, Mr. Moore [was] "upset" because of the medical decision to discontinue his narcotic pain regimen in favor of a non-steroidal anti-inflammatory medication. (COR018).  As indicated in the medical records, Mr. Moore reported to the medical staff that he had received narcotic pain medications [Norco or Lortab] for more than two and a half years and that he wished to meet with the site physician [to discuss the discontinuation of this medication]. (COR018-19). . . . Following this appointment, [the CRNP] received orders [from the site physician that Mr. Moore "continue Motrin and"] undergo x-rays of his [right] knee[]. . . . [COR019 and] (COR009).

Mr. Moore underwent the ordered x-rays on August 27, 2012. (COR074–76).  The x-ray results did not reveal any significant differences from the prior x-rays taken in October of 2010 [COR037].  Mr. Moore next attended another follow-up appointment with the site physician at Limestone on August 28, 2012 [at 7:34 a.m.], at which time the physician examined Mr. Moore and again confirmed the on-going degenerative effects of the osteoarthritis upon Mr. Moore's left hip joint. (COR027). During the course of this exam, the site physician noted some potential "spurring" at the femoral head and neck and discussed with Mr. Moore the possibility of utilizing an MRI to further evaluate this potential development. (COR027). Following this appointment, the site medical director requested that we consider whether an MRI of Mr. Moore's left hip would be advisable, which led to a series of discussions related to his condition. (COR009, 077). At that time, I requested and received the relevant documents from Mr. Moore's file, including his prior x-ray results, which confirmed to me that there was no need for an MRI and that no additional information could be obtained through the use of an MRI that had not been previously confirmed through the x-rays taken as of that point in time. (COR077).[8]

The site physician at Limestone continued to monitor Mr. Moore's condition during a September 7, 2012, appointment in response to Mr.

---

[8] The site physician completed his examination of Moore at approximately 8:00 a.m. (Doc. 31-2 at 29), and entered the Consultation Request on the Provider's Orders sheet at 8:58 a.m. Doc. 31-2 at 10.  The medical records indicate that Dr. Hood's office received the Consultation Request later that morning via facsimile. Doc. 31-2 at 78.  Dr. Hood issued his denial of the Consultation Request for an MRI at 3:54 p.m. (Doc. 31-2 at 78), several hours after receipt of the request, providing him ample time to obtain relevant records from Moore's medical file, including the radiology report from the x-rays performed the previous day, and consult with on-site physicians prior to determining that an MRI was not necessary.

Moore's requests. (COR028, 079). Mr. Moore received orders following this appointment, directing him to return for a follow-up appointment in 30 days. (COR010). . . .

In orders dated October 17, 2012, and November 26, 2012, Mr. Moore received orders for continuing anti-inflammatory medications including   Naproxen and Tylenol. (COR010). The site physician at Limestone met with Mr. Moore, ADOC personnel and the attending registered nurse on duty on October 3, 2012, to discuss the decision not to proceed with an MRI at that time. As the site physician explained to Mr. Moore and documented in his notes from this occasion, an MRI for arthritis was not indicated. . . . As also indicated, the site physician assured Mr. Moore that he would consult with me, review the x-rays already taken and consider any available options for the treatment of his condition which would effectively decrease any discomfort. (COR029). The site physician continued to monitor Mr. Moore's condition through appointments on November 26, 2012, January 3, 2013 and May 16, 2013. (COR032–33). During the May 16, 2013, appointment, the site physician again discussed with Mr. Moore the absence of any justification for continuing his narcotic pain medication. (COR033).[9]

***

Mr. Moore received a renewal of his Naproxen prescription on [January] 3, 2013 [and a 90-day prescription for Voltaren on March 3, 2013]. (COR011). In orders dated [May 16, 2013 and] June 3, 2013, the medical staff notified Mr. Moore that he would not receive any refills for any prescriptions without an appointment with the clinician. (COR011). . . . He submitted his next sick call request form in December of 2013, complaining of pain in his hips for which he was evaluated during the course of sick call. (COR086–88). Mr. Moore received analgesic balm per orders entered following sick call dated December 4, 2013. (COR011).

Mr. Moore transferred from Limestone to Staton Correctional Facility on December 9, 2013. (COR089). Five days after arriving at Staton, Mr. Moore began submitting multiple sick call request forms [requesting] a bottom bunk profile and additional pain medication. (COR093–98). In response to these initial sick call request forms, the Staton medical staff evaluated Mr. Moore and this examination did not reveal any alteration of his condition or any justification to alter his medication regimen at that time.

On January 16, 2014, Mr. Moore underwent an exhaustive examination by one of the site clinicians at Staton with respect to his

---

[9] In his notes, the physician advises he has "again decided against [an off-site] consult" for evaluation of Moore's degenerative joint disease and further states that he "see[s] no indication for narcotics including Ultram for DJD." Doc. 31-2 at 34.

complaints of continuing bilateral hip pain. (COR013). During this appointment, Mr. Moore specifically reported that a prior examination by a rheumatologist had not resulted in any "significant findings" which occurred "years ago." (COR013). The physical examination did not reveal any muscular weakness or atrophy and he appeared to be able to walk without any noticeable discomfort of any kind.  Mr. Moore only reported pain during range of motion testing when he rotated his legs outward.  At the conclusion of this appointment, the clinician specifically [prescribed Mobic,] directed Mr. Moore to engage in daily weight bearing exercise to continue to maintain his hip and [leg] strength and provided him with an ice pack to the extent that he experienced any soreness.  The clinician also instructed Mr. Moore exactly how he should modify the process for accessing his top bunk and to report any problems that he might encounter in the future. (COR013).  After this examination, Mr. Moore did not submit another sick call request form for over five (5) months. (COR102).

On May 26, 2014, Mr. Moore refused [his regular physical, "including vital signs, blood [and] sugar test[s], urinalysis, Labs, education, rectum exam, oral screening, EKG, eye exam and dentist."].  (COR101).  Almost one month later [on June 23, 2014], Mr. Moore submitted a sick call request form related to hip pain and difficulty accessing his top bunk. (COR102). He received an evaluation during sick call on June 26, 2014, which again revealed the same symptoms previously reported without any worsening of his condition. (COR102–104).

Orders dated July 16, 2014, reflect the continuation of Mr. Moore's prescription of Mobic. (COR012). On that same day, Mr. Moore also received orders to undergo certain labwork. (COR012).

Mr. Moore saw the Staton clinician again on July 30, 2014, at which time he reported complaints of "hip problems for years" and "bone spurs." (COR014).  The only change noted during the physical examination from the prior examination in January of 2014, entailed Mr. Moore's reports of discomfort upon hip flexion or rotation, but there were no objective signs or symptoms which would otherwise indicate any alteration of his condition. As indicated in the notes from the clinician, the clinician did discuss the possibility of an MRI with Mr. Moore; however, his notes clearly indicate an intention to proceed with an MRI, only if it would provide useful information not otherwise discernible from the x-rays. (COR014). Following this appointment, Mr. Moore received orders to undergo another battery of x-rays related to his hips. (COR012). He also received a renewal of his current medications, orders to undergo additional lab testing and an order directing him to follow-up with the Staton clinician in two to three weeks. (COR012).  In order to attempt to assuage Mr. Moore's concerns,

the clinician also provided him with a bottom bunk profile for a period of 90 days, which remains in effect as of [September 8, 2014]. (COR105).

Mr. Moore underwent another set of x-rays on August 8, 2014, which revealed only "mild osteoarthritis" in both hips. (COR107). As with the prior x-rays, this most recent set of x-rays merely confirmed the absence of any significant changes in his medical condition since October of 2010. When the medical staff next evaluated Mr. Moore on August 18, 2014, he did not voice any complaints related to hip pain. (COR015).

Mr. Moore is currently scheduled for another appointment with the medical staff on October 14, 2014. (COR012). Given the extent of care provided to Mr. Moore at Limestone and Staton, I do not believe that the course of treatment Mr. Moore received was inappropriate in any way or that the conduct of the Limestone and Staton medical staff fell below the standard of care of that provided by other similarly situated medical professionals. Given this course of treatment, in my professional medical opinion, the Limestone and Staton medical staff acted appropriately in all respects. Again, based upon my review of Mr. Moore's medical records, I can state to a degree of medical certainty that the members of the medical staff at Limestone and Staton fully satisfied the standard of care owed by them within the State of Alabama.

With respect to Mr. Moore's request that the Court intervene in some manner related to his medical care, Mr. Moore is currently receiving excellent medical care. There is no evidence or objective data of any kind suggesting that Mr. Moore's condition changed, worsened or declined in any way as a result of the care he has received during his incarceration. I cannot identify any meaningful diagnostic benefit of an MRI at this point. Moreover, the x-ray results obtained have clearly identified the cause of Mr. Moore's current discomfort which is mild osteoarthritis, for which he is currently receiving treatment consistent with the standard of care, i.e., regimen of non-steroidal anti-inflammatory medications. Any allegation by Mr. Moore that he currently does not have access to the medical services available to him at Staton is simply untrue.

Doc. 31-1 at 9–14 (internal paragraph numbering omitted) (footnotes added).

Considering the passage quoted above, the Medication Administration Record contradicts Moore's assertion that the defendants denied him medication for treatment of the pain associated with his osteoarthritis. Specifically, these records, with respect to information relevant to the claims made the basis of the instant complaint, demonstrate

that medical personnel continuously prescribed and provided Moore medications in an effort to alleviate the pain associated with his arthritic condition.  From January of 2012 until September of 2014, Moore received prescriptions for Lortab, Norco, Motrin, Ultram, Naproxen, Tylenol, Voltaren, an analgesic balm, and Mobic. Doc. 31-2 at 8–13 & Doc. 31-4 at 2–50.  In addition, it is undisputed that medical personnel issued profiles to Moore when they deemed his condition to warrant them. Doc. 31-2 at 47 & 31-2 at 6 & 19.

Under the circumstances of this case, the court concludes that the course of treatment undertaken by Dr. Hood and the medical staffs of Limestone and Staton did not violate Moore's constitutional rights.  Specifically, there is no evidence upon which the court could conclude that Dr. Hood or any other member of the medical staffs that provided treatment to Moore acted in a manner that was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to the fundamental fairness." *Harris*, 941 F.2d at 1505.  Rather, the evidence before the court demonstrates that medical personnel, including the nursing staffs and site physicians, examined Moore for his complaints of hip pain associated with osteoarthritis, prescribed medications to Moore in an effort to treat his pain and ordered x-rays to aid in treating his condition.  Whether Dr. Hood "should have [approved] additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545 (internal citation omitted).  In addition, to the extent Moore

complains that Dr. Hood should have allowed continuous prescriptions for narcotic pain relievers and pursued a mode of treatment other than that prescribed, this allegation does not "rise beyond negligence to the level of [deliberate indifference]." *Howell v. Evans*, 922 F.2d 712, 721 (11th Cir. 1991); *Hamm*, 774 F.2d at 1505 (holding that an inmate's desire for some other form of medical treatment does not constitute deliberate indifference violative of the Constitution); *Franklin*, 662 F.2d at 1344 (holding that a simple divergence of opinions between medical personnel and an inmate-patient does not violate the Eighth Amendment).

As a result, the court concludes that the alleged lack of medical treatment did not constitute deliberate indifference.  Moore's self-serving statements of a lack of due care and deliberate indifference do not create a question of fact in the face of contradictory, contemporaneously created medical records. *Whitehead*, 403 F. App'x 401, 403 (11th Cir. 2010); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253–54 (11th Cir. 2013) (same).  In addition, Moore has failed to present any evidence showing that the manner in which medical personnel addressed his condition created a substantial risk to his health that Dr. Hood or the attending health care professionals consciously disregarded.  The record is therefore devoid of evidence— significantly probative or otherwise—showing that Dr. Hood or any other medical

professional acted with deliberate indifference to a serious medical need experienced by Moore.  Summary judgment is due to be granted in favor of the defendants.

## IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.      The defendants' motion for summary judgment (Doc. 31) be GRANTED, and judgment be entered in favor of the defendants.

2.      This case be DISMISSED with prejudice.

3.      The costs of this proceeding be taxed against the plaintiff.

It is further ORDERED that on or before **May 17, 2017** the parties may file objections to this Recommendation.   A party must specifically identify the factual findings and legal conclusions in the Recommendation to which the objection is made; frivolous, conclusive, or general objections will not be considered.  Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's Recommendation shall bar a party from a *de novo* determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11TH Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 3rd day of May, 2017.

_____
                    /s/ Gray M. Borden
UNITED STATES MAGISTRATE JUDGE